## P. & B. STORAGE & TRANSFER COMPANY, INCORPORATED, v. ELSIE LANE.

Western Section. February 7, 1930.

Petition for Certiorari denied by Supreme Court May 24, 1930.

238

Clyde H. Koen, of Memphis, for defendant in error.

Wilson, Gates & Armstrong and L. D. Bejach, all of Memphis, for plaintiff in error.

OWEN, J. P. & B. Storage & Transfer Company, Incorporated, hereinafter called defendant, has appealed from a judgment rendered in the Circuit Court of Shelby County in favor of Mrs. Elsie Lane, plaintiff, for the sum of seven thousand five hundred ($7500) dollars.

It appears there have been two trials. There was a verdict in the first trial for fifteen thousand ($15,000) dollars and upon a motion for a new trial the motion was sustained on the grounds of newly discovered evidence and the amount of the verdict.

On the second trial there was a verdict for ten thousand ($10,000) dollars, upon motion for a new trial a remittitur for two thousand five hundred ($2500) dollars was suggested, this was accepted under protest, the motion was overruled and the defendant prayed and perfected an appeal and has assigned errors. At each trial there was a motion for a directed verdict at the conclusion of all the evidence, which motions were overruled. The defendant perfected and filed its wayside bill of exceptions as to the first trial. The facts as developed by the plaintiff in both trials are almost identical. It is conceded by counsel representing both parties that the facts as far as plaintiff's case is concerned are the same in substance in both bills

of exceptions or in other words there is no material difference between plaintiff's evidence in the first trial and that given in the second trial.

The defendant has assigned seven errors, these errors raise four propositions. (1) There is no evidence to support the evidence of the jury in the first trial and no evidence to support the verdict of the jury in the second trial.

(2) The court was in error in not granting a motion for a directed verdict at the conclusion of all the evidence, both at the first and second trial, for the following reasons:

(a) The undisputed evidence showed that the plaintiff was a licensee in the defendant's building and that there was no evidence to show that the defendant was guilty of any wilful or wanton negligence.

(b) On the undisputed proof and all reasonable inferences to be drawn therefrom, there was no evidence of any negligence on the part of the defendant which was the proximate cause of the plaintiff's injuries.

(c) The evidence showed without dispute that the plaintiff was not in the exercise of ordinary care for her own safety and that she was at the time and place of the accident guilty of contributory negligence as a matter of law.

(3) The court erred in overruling defendant's motion for a new trial because the court did not approve the verdict of the jury and refusing to pass upon the question of whether the verdict was supported by a preponderance of the evidence.

(4) The verdict is excessive and so excessive as to indicate passion, prejudice and unaccountable caprice on the part of the jury.

We will dispose of the assignments under heads 1 and 2 together. On May 21, 1928, the plaintiff, a widow twenty-nine years of age, in company with her sister, Mrs. Ora Crittenden, and a Mr. R. L. Hicks, left Carruthersville, Missouri, in a truck driven by Hicks, with the object of coming to Memphis to secure the plaintiff's furniture which had been stored some months previously with the defendant. The defendant operates a bonded warehouse for storing articles, on Main Street in Memphis, Tennessee. The plaintiff had formerly lived in Memphis and upon the loss of her husband she moved to Carruthersville to live with her sister, storing her household goods with the defendant company before leaving Memphis.

The day the plaintiff received her injuries, May 21, 1928, the plaintiff and the other two parties who accompanied her from Carruthersville, arrived in Memphis about 10:30 or 11:00 A. M. The plaintiff went to the office of the defendant company and then and there informed the manager of the defendant company, Mr. Parrott, who she was and that she had brought a truck with her to take back to Missouri part of her furniture; that she wanted to deliver her

sewing machine to a relative on North Main Street and that she wanted to sell part of her furniture, taking back to Missouri that part that she did not dispose of in Memphis. She also ascertained what her storage bill was and paid it, thereupon Mr. Parrott called a Mr. McBride, superintendent of the defendant's warehouse, and instructed McBride to take the plaintiff and her sister and see about her furniture. Thereupon McBride took the plaintiff and her sister to the third floor of defendant's warehouse using a large elevator, which elevator is used for lifting furniture as well as employees and customers of the defendant company. They procured the machine, brought it down, placed the machine in Hicks' truck and the plaintiff left with her sewing machine. Within a very few minutes the plaintiff returned to defendant's place of business accompanied by a second-hand furniture dealer. Mr. McBride took the plaintiff and this prospective buyer of her furniture to the third floor where all of plaintiff's furniture was stored. This dealer did not purchase any of plaintiff's furniture. The plaintiff then left the third floor on the elevator operated by McBride, came down to the ground floor and went out in search of another second-hand furniture dealer. She soon returned with a Mr. Duffy who operated the Cole Furniture Company. She and Mr. Duffy took the elevator, operated by McBride, from the ground floor and went to the third floor where Duffy purchased some of the plaintiff's furniture. Duffy left informing plaintiff that he would send a truck and the money immediately for the furniture he had purchased. Shortly thereafter an employee of the Cole Furniture Company came for the Duffy purchase, took this purchase down to the side entrance and was loading it on a truck. The plaintiff requested McBride to take her down to the ground floor so she could collect for the Duffy purchase. McBride took the plaintiff on the elevator to the ground floor and she said, "I told McBride I'd be back just in a minute," she told him that she was going to collect for her furniture, that "I would be back in just a minute, Mr. McBride said 'alright,' that she understood that when Mr. McBride said 'alright' that he would hold the elevator." The plaintiff went to the side entrance and got her money from the Cole Company representative and she returned immediately to the elevator. The record shows that the side entrance is thirty-nine feet from the elevator. While the plaintiff was collecting her money at the side entrance the elevator was moved. She hurried back and stepped into the open elevator shaft. There was no guard rail or door to protect this open space when the elevator was moved. The elevator had been moved to the floor just above the main floor, called the mezzanine floor, just who moved the elevator the record does not disclose. It appears that McBride went to this side entrance after the plaintiff did. McBride said that the party that she sold this furniture to paid her for the

furniture and "we had turned and started back, I stopped, giving some men some instructions, and when I got to the door, I saw her entering the elevator shaft or about it, and saw these ropes and saw the elevator was up, and hallooed at her." The plaintiff said that she did not hear McBride halloo at her. McBride said that the plaintiff did not turn her head when he hallooed. The other parties near the elevator, at the time of the accident, testified and neither one of these testified that they heard McBride halloo. The plaintiff fell about twenty feet down through the basement and into the elevator pit, receiving serious injuries. McBride was the only one who saw her fall and he rushed down the steps to rescue the plaintiff, later the elevator was brought down and the plaintiff was brought to the first floor. The proof shows that this elevator, when stopped, would stop about twelve or fifteen inches below the floor surface. It did not stop level with the floor and when Mrs. Lane entered the elevator she had to step down and when she came out she had to step up. She testified that the day of the accident was cloudy and it was rather dark in the warehouse; that she thought McBride was on the elevator and knowing that she had to step down she made the fatal step. The plaintiff alleged in one count of her declaration that the defendant had violated a certain city ordinance and by reason of the violation of said ordinance, plaintiff received her injuries. Said ordinance is as follows:

"Sec. 172. All freight elevators now in use, or hereafter installed in old buildings, must have the floor openings enclosed on three sides, not less than five feet high, placed at each landing, and have efficient self-closing gates."

It is admitted that the gate which enclosed the elevator shaft, when the elevator was removed, was broken and not working.

Counsel for the defendant insists that its motion for a directed verdict should have been sustained, first, because the plaintiff was a mere licensee and not an invitee and that the plaintiff knew that the elevator shaft was unguarded; that there were no lights and the plaintiff had made three trips on the elevator and was thoroughly familiar with the conditions of the elevator shaft and that the plaintiff did not use ordinary care to avoid the injury and that she was guilty of contributory negligence as a matter of law, and that her contributory negligence was the proximate, direct and efficient cause of her injuries.

We are of the opinion that under the facts of this case the plaintiff was an invitee of the defendant. She was a customer of the defendant, she notified the manager of the defendant company that she would take out the sewing machine; that she would sell part of her furniture and remove the balance. He agreed to this and placed her in charge of the superintendent of the warehouse, McBride.

"Invitation by the owner or occupant is implied by law, where the person going on the premises does so in the interest or for the benefit, real or supposed, of such owner or occupant, or in the matter of mutual interest, or in the usual course of business, or where the person injured is present in the performance of duty, official or otherwise." Sherman & Redfield on Negligence (6 Ed.), section 706; Warehouse & Cold Storage Company v. Anderson, 141 Tenn., 294.

Now as to the question of barring plaintiff's recovery on the question of contributory negligence, less than one hour elapsed from the time plaintiff entered the defendant's warehouse, stated to the manager what she desired with reference to her furniture and the manager placed her in charge of McBride, the superintendent of the warehouse, and the time that plaintiff was injured. She had made three trips on the elevator to the third floor. The greater portion of her furniture was still on the third floor, her sister and Mr. Hicks were arranging this furniture to bring it down and place it in Hicks' truck. McBride knew that the plaintiff had to return to the third floor, he agreed to hold the elevator for her, he knew that she had to go a short distance to collect the money for the furniture she had sold and which had been brought from the third floor. It took her but a minute to walk thirty-nine feet, ask for the money, it was handed to her and she immediately returned. McBride, who had agreed to hold the elevator and who was always on the elevator when the plaintiff stepped down and on the elevator, had evidently left it but a moment, he was giving some orders to some men and he saw plaintiff's danger. The theory of all negligent cases is that the defendant has violated some legal duty he owed plaintiff. McBride, superintendent for the defendant company, owed the duty to the plaintiff, in our opinion, to hold the elevator for her after he had agreed to. He left the elevator and someone moved it. The defendant owed the plaintiff the duty of seeing that the open shaft was protected by a gate or guard rail in compliance with the city ordinance of Memphis.

The owner or occupier of premises, who induces others to go thereon by invitation, express or implied, owes to such others the duty to use reasonable, ordinary care to keep them in a safe and suitable condition so they will not be unreasonably exposed to danger.

Mrs. Lane had a right to presume that McBride would hold the elevator for her for the short time it took her to walk less than eighty feet to the side entrance and return. He had promised to hold the elevator and by his conduct he had lulled the plaintiff into a sense of security. Plaintiff, finding no guard rail or gate and knowing that she had to step down to get on the elevator, and there being, as she testified, no light in the opened shaft beneath the first floor, she was not negligent in assuming that she was not exposed to danger, which could come to her only from the violation of a duty owed by the defendant to her.

In Ellis v. Cotton Oil Company, 3 Hig., 643, Mr. Justice Hughes, speaking for the Court of Civil Appeals, said:

"One is not chargeable with contributory negligence in failing to look for danger which can come only from a violation of such duty and where from surrounding circumstances there was no reason to apprehend danger."

Learned counsel for the defendant relies upon the case of Knoxville v. Cain, 128 Tenn., 250. In that case Cain forgot about some stakes that had been driven into the street and he fell by stumbling against one of these stakes and was injured. He knew the stake was there but failed to remember. If the plaintiff had been informed that the elevator was going back to the third floor or if she had not been assured that it would be waiting for her when she returned, then the case of Knoxville v. Cain would be applicable.

In the case of Ellis v. Cotton Oil Co., supra, Ellis had sued the Cotton Oil Company for injuries he received in walking on a conveyor at nighttime. He was an employee of the Cotton Oil Company. Judge Pittman, in sustaining the motion for a directed verdict said: "The evidence of the plaintiff shows that he must have been more familiar with this thing than anybody in the world. . . .

"Now, if the officers of the company were charged with knowing whether a foot would slip through there, certainly this man was charged with the same knowledge."

On appeal the Court of Civil Appeals said:

"The question is, was the action of the trial court in directing a verdict correct?

"It occurs to us that the course he took was assuming the functions of a jury. We are of opinion it cannot be said as a matter of law that Ellis was more familiar with the dangers of the situation than anyone else, but rather that the company which had constructed the conveyor might well be held chargeable with more knowledge of its defects than one who simply had occasion to use it. Not only this, but to say as a matter of law that Ellis knew more, or even as much, about the condition of the conveyor as did the cotton oil company, is to draw a conclusion diametrically opposite to his positive swearing to the effect that he had never had occasion to notice the rods; and not only this, but others who had been using this way as had Ellis, without exception, swear they had no such notice; and the holding is in the face of all this testimony. Further, to say as a matter of law that Ellis was so negligent in using the way as to bar his right of recovery is to say that the question of his negligence is not one about which reasonable men could differ.

"Another matter insisted on by counsel for the Cotton Oil Company is that it was gross negligence on the part of Ellis to go over this structure at the time he did, it appearing in the evidence that it was

at night when the place was very dark, not being lighted, and that it had been raining all day, and the rods and all surroundings were wet. The reply to this contention is that Ellis had a right to assume that the way which the company had constructed or placed there for use, and which was constantly being used, and which he was invited to use, was safe.

"The owner or occupant of premises who induces others to come upon it by invitation, express or implied, owes to them the duty of using reasonable or ordinary care to keep the premises in a safe and suitable condition, so that they will not be unnecessarily or unreasonably exposed to danger." 29 Cyc., 453.

"The general rule is that every person has a right to presume that every other person will perform his duty and obey the law, and in the absence of reasonable ground to think otherwise it is not negligence to assume that he is not exposed to danger which can come to him only from violation of law or duty to such other person." 29 Cyc., 516. "And if the conditions are such as to mislead a person, failure to discover danger is not negligence. So negligence is not imputable to a person for failing to look for danger when under the surrounding circumstances he had no reason to apprehend any." 29 Cyc., 514.

"To constitute contributory negligence the act or omission of the person injured must be one which he could reasonably anticipate would result in his injury." 29 Cyc., 520.

"But after all, the question before this court is not whether Ellis was guilty of contributory negligence, but the question here is whether that question was so far debatable as that it should have been submitted to a jury. The test as established by our Supreme Court is well expressed in the following rather lengthy quotation from Traction Co. v. Brown, 7 Cates, 323, 329:

"A motion for peremptory instructions is not one which addresses itself to the discretion of the court, but one which presents a question of law; and the crucial question in the case is whether there is any determinative evidence upon which the jury must base a verdict in favor of the party who produces it.

"It is said in the case of Grand Trunk Railroad Company v. Ives, 144 U. S., 417, 12 Sup. Ct., 679, 36 L. Ed., 485, that the terms 'ordinary care' and 'reasonable prudence' and such like terms, as applied to the conduct and affairs of men, have a relative significance, and cannot be arbitrarily defined. What may be deemed ordinary care in one case may, under different surroundings and circumstances, be gross negligence. The policy of the law has relegated the determination of such questions to the jury under proper instructions from the court. It is their province to note the special circumstances and surroundings of each particular case, and say whether the conduct

of the parties in that case is such as would be expected of reasonable prudent men under a similar state of affairs. When a given state of facts is such as reasonable men may fairly differ upon the question as to whether there was negligence or not, the determination of the matter is for the jury. It is only where the facts are such that all reasonable men must draw the same conclusions from them that the question of negligence is ever considered one of law for the court.

"To support this proposition, a large number of cases are cited.

"Substantially the same rule is laid down in District of Columbia v. Moulton, 182 U. S., 577, 21 Sup. Ct., 840, 45 L. Ed., 1237, in these words: 'The question of negligence or no negligence is one of law for the court, but where one inference can reasonably be drawn from the evidence.'

"This case approves also the language in the case of Warner v. B. & O. Ry. Co., 168 U. S., 339, 18 Sup. Ct., 68, 42 L. Ed., 491, as follows: 'It is only where the evidence is such that reasonable men may fairly differ as to the deductions to be drawn therefrom that the determination of the fact of negligence should be left to the jury.'

"In Traction Co. v. Carroll, 113 Tenn., 514, 82 S. W., 313, it is said: 'The rule is that any act must be held negligence in law, or negligence as a matter of law, where no reasonable difference of opinion can exist among men as to the negligent character of the act.'"

These rules, of course, apply to plaintiffs and defendants alike, or whether the acts are to be considered under the designation of negligence or contributory negligence.

Now, in the light of these well-settled rules of law, and of the facts of this case, to say that all reasonable men would draw the conclusion that Ellis was guilty of contributory negligence in using the way actually provided for him, and which he saw others daily using, it occurs to us is to draw conclusions contrary to the experience of all men, and contrary to their acts as they are daily observed. If the action of the trial court in directing a verdict in this case can be sustained it must be on the theory that the danger was so open and glaring that no reasonable man would have gone into it, and yet all others who had occasion to use it were going into it every day in the year. Such a holding would not be logical. It would have the effect of holding that all the men who had occasion to go from the railroad track to the office of the cotton oil company, both employees of the railroad company and of the cotton oil company, were unreasonable men, and that, too without a syllable of evidence to that effect except that they used this way. It appears impossible to sustain such a conclusion. Who are reasonable men? Only those who see as a particular man sees? If so, then all men may be unreasonable except that one man.

The fact that the elevator shaft was dark, in our opinion, cannot affect the right of the plaintiff to go to the jury. The plaintiff had

been assured that the elevator would be there upon her return. She was gone but a minute or two. McBride had assured her that the elevator would be waiting. She knew that she had to step down to step on the elevator and there being no guard rail or gate to prevent her from stepping into the space where she had left the elevator and the fact that McBride was looking after the plaintiff, his evidence indicates that for a moment he forgot his promise to plaintiff and he undertook to give some orders to two workmen and then his eyes and mind went back to the plaintiff and he saw that the elevator had been moved. He knew the shaft was unguarded but it was too late to save the plaintiff from her injury.

We are of the opinion that this is a proper case, under all the facts and circumstances, to submit the question of contributory negligence to the jury and we find material evidence to sustain the verdict. The defendant's assignments of error in the wayside bill of exceptions and also as to the last trial, going to the question of a directed verdict, are overruled.

It is next insisted that the trial judge would not approve of the verdict of the jury. The trial judge, in ordering the remittitur and in overruling the motion for a new trial said: "This is a very close case and twenty-four jurors having passed on it, finding for the plaintiff, the court overruled the motion for new trial." It is defendant's insistence that by this language the court meant that twenty-four jurors had passed on the case and he declined to interfere.

Counsel relies, in support of this assignment, upon the following cases: Tel. & Tel. Co. v. Smithwick, 112 Tenn., 463; Railroad v. Lee, 95 Tenn., 388; Railroad v. Brown, 96 Tenn., 559; Railroad v. Neely, 102 Tenn., 700; Hamburger v. I. C. Railroad Co., 138 Tenn., 123; Hurt v. Railroad, 140 Tenn., 647; Railroad Co. v. Melvin, 5 Tenn. App., 94.

In Tel. & Tel. Co. v. Smithwick, supra, the cause was tried before a special judge, and in overruling the motion for a new trial he said:

> "The court has grave doubts whether he should not set aside the verdict and believes he would do so if he were the regular judge."

In Railroad v. Neely, supra, the trial judge in overruling the motion for a new trial said:

> "That the facts in the case were considerably mixed but that it was a rule of his to rarely invade the province of the jury in setting aside their verdicts if there are any substantial facts to support the same."

In Railroad v. Brown and in Railroad v. Lee, supra, the trial judge refused to pass upon the motion and stated that he would leave it to the Supreme Court to decide the matter.

In all the other cases it is quite clear that the trial judge was not satisfied with the findings of the jury. In the instant case the trial judge approved the verdict in favor of the plaintiff in all things except as to the amount. He stated that it was a close case, which is true as there is a great conflict in the evidence, but he had submitted the issues to the jury under a proper charge and there is no complaint made as to the court's charge. Neither side submitted a special request and while the trial judge said that it was a close case, he approved of the verdict of the jury and in favor of the plaintiff's contention. We do not think the language of the trial judge shows that he was dissatisfied with the finding of the jury. He had given the defendant a new trial on newly-discovered evidence. Two witnesses had filed affidavits contradicting some of plaintiff's evidence. The defendant had the benefit of these two witnesses on the second trial. The insistence that the trial judge did not approve of the verdict is overruled.

On the question of the verdict being excessive, the plaintiff was twenty-nine years of age at the time she testified, which was about one year after the accident. She was a widow and had operated a rooming house on Manassas Street in Memphis, Tennessee. About a year after her widowhood began she decided to give up the rooming house, stored her furniture with the defendant and returned to her former home in Missouri to live with her mother and sister. Her right leg was broken above the knee, sharp fragments of bone from the broken femur cut the tendons of the knee cap practically in two. Her leg was placed in a cast soon after the accident, the knee was so swollen it was not feasible or practical to operate upon the knee. Her ankle was fractured, there being a crack in the bone of the ankle. Her back was wrenched, an X-ray picture showed that as to her back, the pelvis was torn from the spine. The surgeons called this injury to the back a sacro-iliac dislocation. Her leg was badly bruised and after her leg remained in a plaster cast for three weeks this cast was removed. It was found that the bones of her leg had not properly knitted because flesh had gotten between the ends of the bones. An operation was necessary to remove this flesh and a bone graft operation was performed. The plaintiff, after this operation, was placed in another cast and her leg remained in the second cast for fourteen weeks and three days. Plaintiff remained in the Baptist Hospital for eleven weeks, then was removed to Dr. Henry Hill's clinic where she remained until December 7, 1928. She was treated from the day of her injuries up to December 7, 1928, a period of about seven months, by Dr. Henry Hill and Dr. Jarrell Penn. After removing the cast from her body which cast covered all of her right leg to the toes, her left leg to the knee and her body to her nipples, she had to wear a brace for the protection of her back. The plaintiff had spent in the

hospital, medical bills and surgeons' fees, about $1400. Her knee is stiff, there is not much movement in the knee. Dr. Hill is of the opinion that another operation would give some relief to the movement in the knee, this would cost from $500 to $700. There are some injuries of a permanent nature to the plaintiff's knee and her back. The plaintiff was still suffering from pains in her back and knee at the time of the last trial which was a little more than a year after the accident. The plaintiff suffered severe pain from the injuries.

We are of the opinion. that from all the injuries, physical suffering and mental anguish and the expenses incurred by the plaintiff, the judgment for $7500 is not excessive. All of the defendant's assignments of error are overruled and disallowed.

The plaintiff has assigned error on the question of the court ordering the remittitur and has filed a very able brief and made a splendid argument insisting that the remittitur should be restored.

Counsel for the defendant, in their able brief, are of the opinion that the remittitur was ordered because the jury did not mitigate the damage after they found that the plaintiff was guilty of remote contributory negligence. Just why the trial judge suggested this remittitur does not clearly appear. The plaintiff did not prove any earning capacity at the time she was injured or that she lost any earning power by reason of the accident. The trial judge saw the plaintiff at two trials and there is some proof tending to show that the injuries will not be permanent, but her injuries will last for many months. She did not lose her limb and will probably, within a year, discard her crutches. The trial court having seen and heard all the witnesses and being of the opinion that $10,000 was excessive and refusing to approve a verdict for more than $7500, we are loathe to disturb his judgment in ordering the remittitur.

The plaintiff's assignment is overruled and disallowed. Judgment will be entered here against the defendant for $7500 with interest thereon from the date of the rendition in the Circuit Court and for all the costs of the cause including the appeal for which execution will issue.

Execution will issue against the defendant and its surety on appeal bond for the costs of the cause including appeal costs.

Heiskell and Senter, JJ., concur.